IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:16-CR-00034-FL

| | |
|---|---|
| **United States of America**, | |
| v. | **Memorandum & Recommendation** |
| **Alexis P. Smith**. | |

As it does with many offenders, the State of North Carolina released Defendant Alexis P. Smith from prison before the end of his sentence.[1] But Smith's liberation from physical custody came at a price. He had to agree to abide by certain limitations on his liberty and privacy set by the North Carolina Post-Release Supervision and Parole Commission, including a condition that he must submit to warrantless, suspicionless searches by his supervision officer.

This case presents the question of whether officers violated the Fourth Amendment by exceeding the scope of the conditions set by the Commission. On February 24, 2016, supervision officers conducted a warrantless, suspicionless search of Smith's home and uncovered evidence of criminal conduct. Smith alleges that the search violated his Fourth Amendment rights because it was not conducted by his supervising officer. The Government disagrees. Ultimately, because the Commission has the authority to set whatever conditions were necessary to meet the goals of North Carolina's post-release supervision program and because the Commission allowed Smith to retain a limited privacy interest, the undersigned concludes that a search that exceeds the conditions set by the Commission is unreasonable and, therefore, violates the Fourth Amendment.

---

[1] The briefs in this matter display some confusion over whether Smith was on probation or post-release supervision at the time of the events in this case. At the hearing, the court clarified that he was on post-release supervision. Tr. 2:11-18.

I.  **Background**

In August 2015, Smith began a period of post-release supervision after serving time in prison for a probation violation. As part of his supervision, Smith agreed to abide by numerous conditions, including the condition that he would "submit at reasonable times to searches of [his] person, premises, or any vehicle under [his] control by [his] supervising officer for purposes reasonably related to [his] supervision." Post-Release Supervision Order at 5, D.E. 43–2. The Commission indicated that it imposed the conditions on Smith "after careful study and consideration in accordance with North Carolina General Statute § 15A-1368.4."[2] Supervision Order at 3.

Upon his release from prison, the Commission assigned Christopher Cook to supervise Smith. Tr. at 15:3–25, 16:8–10. About three months later, Patrick Oxendine took responsibility for Smith's supervision and remained in this role throughout the events at issue in this motion. Tr. at 16:1–7.

In late February 2016, the North Carolina Department of Public Safety, in conjunction with other law enforcement agencies, launched Operation Zero Hour. Tr. at 16:11–16, 22:20–22. As part of this operation, supervision officers and law enforcement officers conducted warrantless searches and served outstanding arrest warrants throughout Robeson County. Tr. at 16:15–22.

Cook decided to search Smith's home because "he was considered a high risk supervision case." Tr. at 17:1–4. Additionally, officers obtained information that Smith was selling drugs and knew that he had tested positive for using multiple drugs. Tr. at 17:4–8. All of this information caused Cook to believe that Smith was involved in the sale of illegal narcotics. Tr. at 17:9–10.

---

[2] Although Smith agreed to the conditions, he is prohibited by law from refusing to do so. N.C. Gen. Stat. § 15A-1368.2(b).

Cook and five other law enforcement officers–two DPS officers and three local law enforcement officers–arrived at Smith's home at approximately 6:25 a.m. on February 24, 2016. Tr. at 17:13–18, 18:18–20. After learning that Smith was not there, Cook called and told him that he needed to come home so that the officers could conduct a search. Tr. at 17:17–23.

Smith arrived home approximately 15 minutes later. Tr. at 16:24–17:4. Cook informed him that the officers were there to perform a search of his residence, as allowed by his post-release supervision order. Tr. at 19:3–9. Smith then led the officers to his bedroom and unlocked his bedroom door. Tr. at 16:24–17:4. A search of the bedroom uncovered two loaded firearms and marijuana. Tr. at 18:4–8.

Later that day, representatives of the Robeson County Sheriff's Office and the Bureau of Alcohol Tobacco and Firearms interviewed Smith at his home. Resp. to Mot. to Suppress ¶ 7, D.E. 47. After waiving his *Miranda* rights in writing, Smith admitted that the firearms and marijuana found in his bedroom were, in fact, his. *Id.* Smith also admitted that he was aware that he was prohibited from possessing a firearm. *Id.*

In April 2016, a federal grand jury returned a one count indictment against Smith charging him with violating federal law by knowingly possessing a firearm after having been convicted of a felony. D.E. 3. Before trial, Smith filed a motion seeking to suppress evidence obtained from the search of his home and any statements he made to law enforcement after the search. This court held an evidentiary hearing on the motion on January 20, 2017.

## II. Discussion

### A. Overview of Fourth Amendment Rights of Probationers and Parolees

The Fourth Amendment to the Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

shall not be violated[.]" U.S. Const. amend. IV. The Supreme Court has explained that "[a] probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" *Griffin* v. *Wisconsin*, 483 U.S. 868, 873 (1987). However, as demonstrated by a trilogy of cases from the Supreme Court, the standard for what constitutes a reasonable search of a probationer or parolee's home can be exceedingly low.

The Supreme Court first examined the Fourth Amendment rights of probationers in *Griffin* v. *Wisconsin*. In *Griffin*, a probationer claimed that a provision of Wisconsin law authorizing a warrantless search of his home violated his Fourth Amendment rights. *Id.* at 872.

The Supreme Court acknowledged that probationers are entitled to Fourth Amendment protections and that the Court "usually require[s] that a search be undertaken only pursuant to a warrant[.]" *Id.* at 873. But the Court also noted that in numerous contexts it has "permitted exceptions when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Id.*

A state's operation of a probation system presents one of these 'special needs,' because it is "simply one point (or, more accurately, one set of points) on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." *Id.* at 873–74. As a result, parolees and probationers "do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'" *Id.* at 874 (quoting *Morrissey* v. *Brewer*, 408 U.S. 471, 480 (1972)) (alterations in original).

The Court further explained that "[t]hese restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." *Id.* at 875. The state must be able to provide adequate supervision of

4

its probationers to ensure that these goals are met. *Id.* The Court concluded that, "[s]upervision, then, is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.* But, the Court noted, the state's needs in this area are not so great as to justify a complete elimination of a probationer's right to privacy. *Id.*

After balancing Wisconsin's special needs related to probation against the disruption that would occur in the supervision process if a warrant was required before conducting a search of a probationer, the court determined that it was "reasonable to dispense with the warrant requirement." *Id.* at 877.

Several years later, in *United States* v. *Knights*, 534 U.S. 112 (2001), the Supreme Court addressed whether a warrantless search of a probationer based upon reasonable suspicion violated the Fourth Amendment. There, a California court placed Knights on probation for a drug offense. *Id.* at 114. Among the conditions governing Knights's probation was the requirement that he "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." *Id.*

Shortly thereafter, a federal grand jury indicted Knights on various charges after a warrantless search of his home pursuant to his probation conditions turned up evidence linking him to a series of suspicious fires. *Id.* at 116. Knights sought to suppress evidence obtained from the search on the ground that it violated his Fourth Amendment rights.

The Supreme Court began its analysis by "assessing, on the one hand, the degree to which [the probation condition] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 119 (quoting *Wyoming* v. *Houghton*, 526 U.S. 295, 300 (1999)) (internal quotations omitted).

5

With respect to the first factor, the fact that Knights was "a probationer subject to a search condition" resulted in a drastic intrusion on his privacy interests. *Id.* at 119. The court noted that "[j]ust as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." *Id.* The court found that "[i]t was reasonable to conclude that the search condition would further the two primary goals of probation-rehabilitation and protecting society from future criminal violations." *Id.* The Court also considered it relevant that the sentencing judge determined that "it was necessary to condition the probation on Knights' acceptance of the search provision." *Id.* Thus, the Court held that the search condition "significantly diminished" Knights's reasonable expectation of privacy. *Id.* at 1191–20. But the Court left open the question of whether the search condition completely eliminated Knights's reasonable expectation of privacy such that he would be subject to a warrantless search "without any individualized suspicion[.]" *Id.* at 120 n.6.

The Supreme Court then turned to the government's interest in conducting warrantless searches of probationers. The court began by noting that the probation system is based upon the assumption that "the probationer 'is more likely than the ordinary citizen to violate the law.'" *Id.* at 120 (quoting *Griffin*, 483 U.S. at 880). Probationers, according to the court, also have a greater incentive to "conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal" because they are subject to supervision and revocation proceedings which provide fewer constitutional protections than a standard criminal proceeding. *Id.*

After balancing these factors, the Supreme Court determined that the Fourth Amendment "requires no more than reasonable suspicion to conduct a search of" a probationer's house. *Id.* at 121. Thus, "[w]hen an officer has reasonable suspicion that a probationer subject to a search

6

condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interest is reasonable." *Id.*

As noted above, among the issues left undecided in *Knights* was whether a probation condition could diminish the probationer's expectation of privacy to such an extent that the Fourth Amendment would allow a search to occur without any individualized suspicion. *Id.* at 120 n.6. The Supreme Court took up this question, albeit in the context of parolees, in *Samson* v. *California*, 547 U.S. 843, 847 (2006). At issue in *Samson* was a provision of California law that required parolees to "agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." *Id.* at 846. Based upon this condition, a law enforcement officer conducted a suspicionless search of Samson's person, which yielded "a plastic baggie containing methamphetamine." *Id.* at 846–47. After the trial court denied Samson's motion to suppress the evidence obtained from the search, a jury convicted him of possession, and the court sentenced him to several years in prison. *Id.* at 847. Appeals ensued.

The Supreme Court began its analysis of this issue by using the same totality of the circumstances test used in *Knights*: "assessing, on the one hand, the degree to which [the search condition] intrudes upon an individual's privacy and, on the other, the degree to which [the search condition] is needed for the promotion of legitimate governmental interests." *Id.* at 848 (quoting *United States* v. *Knights*, 534 U.S. 112, 118–19 (2001)).

The Supreme Court noted that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Id.* at 850. Samson's privacy interests were also curtailed because the condition on warrantless

7

searches was "clearly expressed" to him and he was "'unambiguously' aware of it." *Id.* at 852 (quoting *Knights*, 534 U.S. at 119). The acceptance of a clearly expressed and unambiguous warrantless search provision "'significantly diminishe[s an individual's] reasonable expectation of privacy." *Id.* (quoting *Knights*, 534 U.S. at 120). Thus, in light of Samson's "status as a parolee, 'an established variation on imprisonment,'" and "the plain terms of the parole search condition," the Supreme Court found that Samson "did not have an expectation of privacy that society would recognize as legitimate." *Id.* (quoting *Morrissey* v. *Brewer*, 408 U.S. 471, 477 (1972)).

Regarding the governmental interest at stake, the Supreme Court found that California had a substantial interest in conducting warrantless searches to promote legitimate government interests. *Id.* at 853. Specifically, it has "an 'overwhelming interest' in supervising parolees because 'parolees . . . are more likely to commit future criminal offenses.'" *Id.* at 853 (quoting *Pa. Bd. of Prob. & Parole* v. *Scott*, 524 U.S. 357, 365 (1998)). And, "a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id.* Thus, the Supreme Court held, the Fourth Amendment did not prohibit law enforcement from undertaking a warrantless, suspicionless search of Samson's home.

These three cases provide the backdrop for assessing the constitutionality of the search of Smith's residence.

**B.    North Carolina Law Regarding Searches of Individuals on Post-Release Supervision**

Upon his release from prison, Smith was subject to a period of post-release supervision. Post-release supervision is "[t]he time for which a sentenced prisoner is released from prison before the termination of his maximum prison term . . . ." N.C. Gen. Stat. § 15A-1368(a)(1). Both

the time for release before completion of an offender's sentence and the length of post-release supervision are set by statute based upon the nature of the offense committed. *Id.* § 15A-1368.2.

The North Carolina General Assembly set out several governmental interests for this period of supervision: "to monitor and control the prisoner in the community, to assist the prisoner in reintegrating into society, to collect restitution and other court indebtedness from the prisoner, and to continue the prisoner's treatment or education." *Id.* § 15A-1368(a)(1).

The Commission is responsible for administering the post-release supervision system. *Id.* § 15A-1368(b). Among its responsibilities is setting the conditions that will govern each offender's post-release supervision period. *Id.* § 15A-1368.4. With an exception not relevant here,[3] the General Assembly lists only one condition that the Commission must impose: "that the supervisee not commit another crime during the period for which the supervisee remains subject to revocation." *Id.* § 15A-1368.4(b).

Beyond that mandatory condition, "[t]he Commission . . . *may* impose conditions on a supervisee it believes reasonably necessary to ensure that the supervisee will lead a law-abiding life or to assist the supervisee to do so." *Id.* § 15A-1368.4(c) (emphasis added). The statute then goes on to discuss various conditions the General Assembly deemed appropriate to achieve the goals of the post-release supervision system. *Id.* § 15A-1368.4(d) & (e).

C. **Constitutionality of the Search of Smith's Residence**

Here, the parties dispute whether, in light of Smith's post-release supervision conditions, the Fourth Amendment allows any supervision officer to conduct a warrantless, suspicionless search of his residence or whether the search may be conducted only by Smith's assigned officer. The Government contends *any* supervision officer may conduct such a search and that the language

---

[3] There are additional mandatory conditions for sex offenders and persons convicted of offenses involving physical, mental, or sexual abuse of a minor. N.C. Gen. Stat. § 15A-1368.4(b1).

9

the Commission used in Smith's post-release supervision order is erroneous and contrary to the applicable statute. Smith contends that the language the Commission used in the post-release supervision order requires that any suspicionless, warrantless searches be conducted only by *his* supervision officer. The Government bears the burden of showing by a preponderance of the evidence that its warrantless search complied with the Fourth Amendment. *United States* v. *Cauthen*, 669 F. Supp. 2d 629, 633 (M.D.N.C. 2009).

Before delving into the parties' arguments, it is important to note one argument that is not before the court. As noted in *Knights*, officers may conduct a warrantless search of a probationer's home if they have reasonable suspicion that the probationer is engaged in criminal activity. *Knights*, 534 U.S. at 121. Given that parolees have fewer privacy rights than probationers, *Samson*, 547 U.S. at 850, it is reasonable to conclude that a parolee's home may be searched without a warrant if an officer has reasonable suspicion that he is engaged in criminal activity.

Thus, at the outset of the hearing on this matter, the court inquired whether the Government's position in this case was that the officers had reasonable suspicion to search Smith's residence or that they did not need reasonable suspicion before conducting a warrantless search. Tr. at 2:19–21. The Government indicated that it was proceeding under the latter theory. Tr. at 2:22–23. Thus, the court will not consider whether the search of Smith's home was permissible because it was supported by reasonable suspicion.

In light of *Samson*, there is no question that the Commission could, if it chose to, authorize warrantless, suspicionless searches of individuals on post-release supervision by any supervision officer. There is also no question that North Carolina law authorized it to do so.[4] *See* N.C. Gen.

---

[4] Although Smith was on post-release supervision, an individual on post-release supervision in North Carolina is the functional equivalent of a parolee as that term is understood in case law. *Compare United States v. Barlow*, 811 F.3d 133, 138 (4th Cir. 2015) (explaining that under North Carolina law, post-release supervision in included as part of the term of imprisonment) *with Samson v. California*, 547 U.S. 843, 851 (2006) (explaining that parole involves an inmate

10

Stat. § 15A-1368.4(c). But it didn't. Vested with discretion by the General Assembly to impose whatever conditions "it believes reasonably necessary to ensure that the supervisee will lead a law-abiding life or to assist the supervisee to do so[,]" *id.*, the Commission chose to impose a search condition that did not completely strip Smith of his Fourth Amendment protections. Instead, the Commission required Smith to submit to warrantless, suspicionless searches only by the supervision officer assigned to him. Thus, the court must decide whether, in this context, a warrantless, suspicionless search by a supervision officer not assigned to Smith is justified by the totality of the circumstances or by the special needs for monitoring post-release supervisees.

### 1. Totality of the Circumstances

As previously discussed, the totality of the circumstances analysis considers "on the one hand, the degree to which [a search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson*, 547 U.S. at 848 (quoting *Knights*, 534 U.S. at 118–19). The former category focuses on the limitations imposed on an offender's privacy due to his status as a supervisee and whether the conditions were clearly and unambiguously expressed to him. *Id.* at 850. The latter category looks at the relationship between the condition at issue and both the State's interest in ensuring the offender's successful reintegration into society and the safety of the community. *Id.* at 853.

#### a. Intrusion on Smith's Privacy Interest

In order to assess whether the February 24, 2016 search improperly intruded on Smith's privacy interest, the court must determine the scope of that interest in light of the conditions of his post-release supervision. Smith's supervision conditions show that he is subject to various limitations on his liberty and privacy as a result of his status as a post-release supervisee.

---

being released from prison before the completion of the term of imprisonment, while still being subject to certain conditions).

Supervision Order, D.E. 43–2. The Commission has imposed numerous restrictions on where Smith may go, what he may do, and whom he may associate with. *Id.* And, it has imposed various limitations on his ability to shield himself from the prying eyes of governmental agents. *Id.*

But these limitations and restrictions are qualified, not absolute. Smith is not required to submit to a warrantless search at any time, only at reasonable times. *See United States* v. *Irons*, -- F. Supp. 3d. --, 2016 WL 7174648, *4 (E.D.N.C. 2016) (suppressing evidence because, among other reasons, a warrantless search of a post-release supervisee was not conducted at a reasonable hour). Law enforcement officers are unable to invoke the post-release supervision conditions to search Smith. *See State* v. *Church*, 110 N.C. App. 569, 576, 430 S.E.2d 462, 466 (1993) (explaining that a warrantless search conducted pursuant to probation conditions may not be undertaken by a law enforcement officer). And Smith may not be searched for general law enforcement purposes, but only for purposes reasonably related to his supervision. *See Irons*, 2016 WL 7174648, at *4. Because these limitations are qualified, Smith retained some privacy interest against governmental intrusion into his home.

An examination of the other conditions imposed by the Commission reinforces Smith's minimal, but existent privacy interest in his home. Smith must "permit a post-release supervision officer to *visit* at reasonable times at [his] home or elsewhere." *Id.* at 3 (emphasis added). However, as discussed above, the Commission has chosen to require Smith to submit to "*searches* of [his] person, premises, or any vehicle under [his] control by [his] supervising officer for purposes reasonably related to [his] supervision." *Id.* at 5 (emphasis added).

Although any post-release supervision officer could have *visited* Smith's home, only his assigned officer could have conducted a *search* of the residence. This is a distinction with a substantial constitutional difference. An officer lawfully in a home may observe any items in plain

12

view (including contraband), but an officer's ability to conduct a search in this circumstance is governed by traditional Fourth Amendment standards. *See Arizona* v. *Hicks*, 480 U.S. 321, 324–25 (1987). Smith had to expect that officers could visit him in his home and observe items in plain view. But he could reasonably expect that they would not be able to search the rest of his home without his assigned supervision officer being present.

Appellate courts have also required strict adherence to the language of a warrantless search condition. In *State* v. *Church*, 110 N.C. App. 569, 430 S.E.2d 462 (1993), the North Carolina Court of Appeals addressed the propriety of a warrantless search conducted pursuant to a condition that required probationers to "[s]ubmit at reasonable times to warrantless searches by a probation officer. . . ." N.C. Gen. Stat. § 15A-1343(b1)(7) (1988). Although the court upheld the search due to the specific facts of that case, it also held that a search pursuant to that condition "cannot be conducted by law enforcement officers, but must be conducted by a probation officer." *Church*, 110 N.C. App. at 576, 430 S.E.2d at 466.[5] Other courts have reached similar results. *See United States* v. *Lara*, 815 F.3d 605, 611–12 (9th Cir. 2016) (suppressing evidence obtained from the warrantless search of a probationer's cell phone because the warrantless search provision of his probation order did not clearly encompass the cell phone); *see also Samson*, 547 U.S. at 856 (rejecting the dissent's argument that the decision allowed searches at the unchecked whim of law enforcement officers because California prohibited arbitrary, capricious, or harassing searches of parolees).

Additionally, this court has recently suppressed evidence from Operation Zero Hour due to a failure to honor the conditions set by the Commission. *Irons*, 2016 WL 7174648, *4. So even

---

[5] The North Carolina Court of Appeals noted that although the search must be conducted by a probation officer, law enforcement officers may be present and participate in the search. *State v. Church*, 110 N.C. App. 569, 576, 430 S.E.2d at 462, 466 (1993). Similarly, there is no reason that other supervision officers and law enforcement officers could not be present and participate in a search conducted by Smith's supervision officer.

though Smith had a reduced expectation of privacy due to his status as a supervisee, he still maintained certain privacy interests based upon the conditions set by the Commission.

Next, the court must consider whether the Commission clearly and unambiguously informed Smith that he would be subject to a warrantless, suspicionless search by anyone other than his assigned supervision officer. It did not. Instead, his supervision order specifies that he will be subject to searches only by his assigned supervision officer. Supervision Order at 5. Add in the fact that, at certain points in the Supervision Order, the Commission subjected Smith to the authority of *any* supervision officer and, at other points, to the authority of only *his* assigned supervision officer, there is no question that Smith had a reasonable expectation that he would not be subject to a warrantless, suspicionless search by anyone other than his assigned officer.

The facts of this case show that although Smith had a reduced privacy interest as a result of his status as a supervisee, the Commission allowed him to retain a limited privacy interest by authorizing only a specific supervision officer to conduct searches of his home under certain conditions. By exceeding the scope of the search condition authorized by the Commission, officers violated the privacy interest that the Commission allowed Smith to retain. Thus, the court must consider whether this violation is justified by North Carolina's interest in monitoring post-release supervisees.

### b. North Carolina's Interest in Monitoring Post-Release Supervisees

The court must next consider "degree to which it is" necessary to allow supervision officers other than Smith's assigned officer to conduct a warrantless, suspicionless search "for the promotion of legitimate governmental interests." *Knights*, 534 U.S. at 118–19. As in *Griffin*, *Knights*, and *Samson*, North Carolina has a substantial interest in monitoring post-release supervisees. The Supreme Court "has repeatedly acknowledged that a State has an overwhelming

interest in supervising parolees because parolees . . . are more likely to commit future criminal offenses." *Samson*, 547 U.S. at 853 (quoting *Pa. Bd. of Prob. & Parole*, 524 U.S. at 365) (quotations omitted). And, "a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id.* (citing *Griffin*, 483 U.S. at 879; *Knights*, 534 U.S. at 121).

Here, North Carolina, through the Commission, has already set out the conditions that it believes are necessary to promote these interests, and those conditions provide for warrantless, suspicionless searches by Smith's assigned supervision officer alone. N.C. Gen. Stat. § 15A-1358(b) (authorizing the Commission to administer North Carolina's post-release supervision program); § 15A-1368(a)(1) (setting out the purposes of the post-release supervision program). Had there been a change in circumstances that justified authorizing additional officers to search Smith's home, the Commission had the ability to modify Smith's conditions at any time. *Id.* § 15A-1368.3(b). The fact that it did not do so shows that North Carolina believed that its interests were sufficiently served by the conditions set in August 2015, which authorized only Smith's assigned officer to search his house for any reason.

The Government asserts that the inclusion of the narrower search condition was an error and that the applicable statute required the Commission to authorize any supervision officer to conduct a warrantless, suspicionless search of Smith's residence. Tr. at 40:19–24. But the language of North Carolina's post-release supervision statutes does not support the Government's argument. While there is a provision allowing supervising officers to *visit* Smith at his home, N.C. Gen. Stat. § 15A-1368.4(e)(6), and a provision requiring Smith to searches of his *person*, *id.* § 15A-1368.4(e)(10), there is no condition in the statute dealing with searches of his home. There is such

a condition for individuals on probation, *id.* § 15A-1343(b)(13), but Smith was not on probation on the day of this search.

There are many reasons why the Commission may have chosen the language that it did. It could have refrained from exercising the full extent of its authority because it placed a substantial value on allowing a supervisee to retain some measure of privacy. Alternatively, it could have agreed with the dissent in *Samson* that allowing any supervision officer to conduct a warrantless, suspicionless search would "inflic[t] dignitary harms that arouse strong resentment in parolees and undermine their ability to reintegrate into productive society." *Samson*, 547 U.S. at 857 (Stevens, J., dissenting). Or, as the Government asserts, it could have just made a mistake.

Regardless of its reason, the Commission chose language, "after careful study and consideration in accordance with North Carolina General Statute § 15A-1368.4[,]" Supervision Order at 3, that would limit which officers could conduct warrantless, suspicionless searches of Smith's home. The State of North Carolina has charged the Commission with setting the necessary conditions to ensure that the goals of its post-supervision release program are met. The court will not substitute its judgement for the judgment of the Commission.

### c. Evaluation of the Totality of the Circumstances

A review of the totality of the circumstances establishes that it was not reasonable for a supervision officer other than Smith's assigned officer to conduct a warrantless, suspicionless search of his residence. Although the conditions of his post-release supervision limited his privacy interests, the Commission did not completely eliminate Smith's privacy interest in his home. Nor did the Commission clearly and unambiguously inform Smith that he would be subject to warrantless, suspicionless searches by anyone other than his assigned supervision officer. Finally, the Commission had the authority to impose conditions which would adequately serve its interest

16

in monitoring Smith, but it decided that it did not need to require him to submit to searches by all supervision officers. Thus, the court finds that the February 24, 2016 search was not reasonable under the totality of the circumstances because it exceeded the search provision included in the supervision order and was not justified by the state's interest in supervising post-release supervisees.

## 2. Special Needs

In *Griffin*, the Supreme Court explained that warrantless searches can be justified by a state's special need to ensure that probation, or in this case post-release supervision, "serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." 483 U.S. at 875. The Government, briefly, suggests that the state's special need to supervise Smith justifies this warrantless, suspicionless search. However, as the court has previously noted, the Commission is authorized to impose whatever conditions it deems necessary to meet the purposes of North Carolina's post-release supervision program, and the Commission has the authority to modify those conditions at any time. Thus, the court cannot conclude that North Carolina's special needs to supervise Smith justifies a search that goes beyond the conditions set out in his post-release supervision order.

The Government contends that the Fourth Circuit's holding in *United States* v. *Midgette*, 478 F.3d 616 (4th Cir. 2007) authorizes the warrantless suspicionless search of Smith's home. In *Midgette*, the Fourth Circuit Court of Appeals upheld an earlier version of North Carolina's statutory provision allowing warrantless searches of probationers. *See United States* v. *Midgette*, 478 F.3d 616 (4th Cir. 2007). But here the court is not addressing whether North Carolina's statutory provision allowing the Commission to require post-release supervisees to submit to warrantless, suspicionless searches is constitutional. Instead, the court is addressing whether the

17

supervision officer's deviation from the conditions of Smith's post-release supervision is constitutional. Thus, *Midgette* does not control in this case and cannot render the search reasonable for Fourth Amendment purposes.[6]

E.  **Exclusionary Rule**

In light of the court's determination that the search of Smith's residence violated the Fourth Amendment, the court must determine whether to suppress the evidence obtained from the search under the exclusionary rule. The exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations." *Davis* v. *United States*, 564 U.S. 229, 236–37 (2011). Before excluding unconstitutionally obtained evidence, the court must weigh the deterrent value of exclusion against the costs of suppression. *Id.* at 237. The exclusionary rule "exacts a heavy toll on both the judicial system and society at large" because "[i]t almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.* The deterrent value will typically outweigh the costs of suppression if law enforcement has shown a "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights . . . ." *Id.* at 238 (quotations omitted). But if law enforcement was operating under a "reasonable good-faith belief" that their conduct was lawful, or if the constitutional violation "involves only simple, isolated negligence," then a court should be hesitant to exclude the ill-gotten evidence. *Id.* (quotations omitted).

Here, Smith claims that suppression is justified, and the Government has not made any arguments to the contrary. A review of the entirety of the record shows that supervision and law enforcement officers acted with reckless disregard of Smith's Fourth Amendment rights when it exceeded the scope of the warrantless, suspicionless search provision contained in Smith's post-

---

[6] The Court of Appeals also noted the importance of specified criteria that would govern warrantless searches. The "criteria impose meaningful restrictions, guaranteeing that the searches are justified by the State's 'special needs,' not merely its interest in law enforcement." *United States v. Midgette*, 478 F.3d 616, 624 (4th Cir. 2007). The court ultimately held that "searches conducted in conformity with the statute" comply with the Fourth Amendment. *Id.*

release supervision conditions. The Commission drafted the more limited search provision, and it was clearly set out in the supervision order. According to the Government, the search provision in Smith's order is a standard condition for individuals on post-release supervision. Tr. at 5:16–21. If the Commission believed a more restrictive condition was necessary to supervise Smith, it had the authority to implement it at any time. N.C. Gen. Stat. § 15A-1368.3(b). It also appears that supervision officers routinely applied the broader search provision provided for in the statute instead of the narrower search provision actually imposed by the Commission. Tr. at 9:1–12; 28:11–22. In this circumstance, the court finds that the deterrent value of the exclusionary rule in this case outweighs the resulting societal costs.

In addition to suppressing unconstitutionally obtained evidence, "[c]ourts will also suppress evidence that is the indirect product of the illegal police activity as 'fruit of the poisonous tree.'" *United States* v. *Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007) (citing *Wong Sun* v. *United States*, 371 U.S. 471, 488 (1963)). The court must determine whether officers obtained this evidence through this illegal activity or through other means untainted by that activity. *Wong Sun*, 371 U.S. at 488.

Smith contends that any statements or physical evidence obtained during the search should also be suppressed. The Government, again, makes no argument to the contrary. As the statements and physical evidence at issue were obtained in the aftermath of the search of Smith's bedroom, it is appropriate to suppress them as well.

### III. Conclusion

Based upon the foregoing, the undersigned magistrate recommends that the district court grant Smith's Motion to Suppress and exclude all evidence and statements obtained from the February 24, 2016 search.

The court also directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on each of the parties or, if represented, their counsel. Each party shall have until 14 days after service of the Memorandum and Recommendation on the party to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without this review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright* v. *Collins***, 766 F.2d 841, 846-47 (4th Cir. 1985).**

Dated: April 7, 2017

*Robert T. Numbers II*
_____
Robert T. Numbers, II
United States Magistrate Judge